IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCIS EDWARD BURTON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  19-2508 |
| Social Security[1] | : | |

## **MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                    June 24, 2020

Francis Edward Burton ("Plaintiff") seeks review of the Commissioner's decision

denying his application for disability insurance benefits ("DIB").  For the reasons that

follow, I conclude that the Commissioner's decision denying benefits is supported by

substantial evidence and will affirm.

## I.    **PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB on August 5, 2015, tr. at 80, 154, alleging that

his disability began on July 31, 2015, as a result of a back injury.  Id. at 80, 154, 192.[2]

Plaintiff's application for benefits was denied initially, id. at 80-85, and Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ"), id. at 87-88, which

---

[1]When this action was filed, Plaintiff named "Commissioner of Social Security" as
the defendant.  Doc. 1 at 4 (ECF pagination).  Andrew Saul became the Commissioner of
Social Security ("Commissioner") on June 17, 2019, and should be substituted as the
defendant in this action.  See Fed. R. Civ. P. 25(d).

[2]For DIB eligibility, a claimant must establish disability on or before his date last
insured ("DLI").  See 20 C.F.R. § 404.101(a); Matullo v. Bowen, 926 F.2d 240, 244 (3d
Cir. 1990).  Plaintiff's DLI is March 31, 2021, well beyond the date of the decision under
review.  Tr. at 16.

took place on March 27, 2018.  Id. at 35-62.  On June 13, 2018, the ALJ found that

Plaintiff was not disabled.  Id. at 16-29.  The Appeals Council denied Plaintiff's request

for review on April 11, 2019, id. at 1-3, making the ALJ's June 13, 2018 decision the

final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on June 10, 2019, Doc. 1, and the

matter is now fully briefed and ripe for review.  Docs. 11, 12.[3]

## II.   <u>LEGAL STANDARD</u>

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.     Whether the claimant is currently engaged in substantially gainful activity;
>
> 2.     If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe

---

[3]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 5.

impairment, the claimant has the residual functional capacity
("RFC") to perform his past work; and

5.      If the claimant cannot perform his past work,
then the final step is to determine whether there is other work
in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§§ 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while

the burden shifts to the Commissioner at the fifth step to establish that the claimant is

capable of performing other jobs in the local and national economies, in light of his age,

education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88,

92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled and is capable of performing his past relevant work.  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at

610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has

plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

III.   **DISCUSSION**

A.      **ALJ's Findings and Plaintiff's Claims**

The ALJ found that Plaintiff suffered from several severe impairments at the second step of the sequential evaluation; degenerative disc disease ("DDD") status post laminectomy and fusion, diabetes mellitus with peripheral neuropathy, trochanteric bursitis of the right hip, and obesity. Tr. at 19. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 20, and that Plaintiff retained the RFC to perform sedentary work with limitations to sitting no more than 30 to 60 minutes at a time, requiring that he be allowed to stand and stretch for 1 to 2 minutes at the workstation every 30 to 60 minutes as needed while on task, to occasionally balancing, stooping, kneeling, crouching, and climbing ramps and stairs, to never crawling or climbing ladders, ropes, or scaffolds, and he must avoid concentrated exposure to extreme cold, vibration, and hazards. Id. at 21. At the fourth step of the evaluation, based on the testimony of a vocational expert, the ALJ found that Plaintiff could perform his past relevant work as a police dispatcher, service order clerk/dispatcher, and protective signal operator. Id. at 27.

Plaintiff claims that the ALJ failed to properly assess the medical opinion evidence and Plaintiff's testimony regarding pain and other limitations. Doc. 11.[4] Defendant responds that substantial evidence supports the ALJ's evaluation of the medical opinion evidence and Plaintiff's complaints. Doc. 12.

---

[4]For ease of discussion, I have reversed the order of Plaintiff's claims.

B.    <u>Plaintiff's Claimed Limitations</u>

Plaintiff was born on February 20, 1955, making him 60 years old on his alleged

onset date, and 63 years old at the time of the ALJ's decision.  <u>Tr.</u> at 39.  He completed

the twelfth grade and has worked as a police dispatcher/radio dispatcher, service order

clerk/dispatcher, and a protective signal operator, <u>id.</u> at 43-44, 59-60, 193, and at the time

of the administrative hearing he continued to work part-time as a police clerk, working

two four-hour shifts a week using a computer to run license plate information.  <u>Id.</u> at 41..

At the administrative hearing, Plaintiff explained that he has long suffered from

back problems.  <u>Tr.</u> at 56.  As will be discussed later, Plaintiff underwent spinal fusion

surgery in 1991, and had a spinal cord stimulator surgically inserted in 1995.  <u>Id.</u> at 56.[5]

In 2003 or 2004, when he was feeling "pretty good," he stopped using the stimulator.  <u>Id.</u>

However, in early August 2015, when Plaintiff was suffering from back pain, the

stimulator, which was not working, was surgically removed and he underwent more

extensive spinal surgery as will be discussed.  <u>Id.</u> at 56-57.

Plaintiff testified that he cannot work because he has so much discomfort that he

can no longer do things he used to do; for example when he tries to help his wife or son

around the house, he has to sit down and get off his feet due to the discomfort.  <u>Tr.</u> at 47.

Plaintiff explained that his part-time work requires mostly sitting, but he is able to get up

at will, and when he finishes his four-hour shift, he is "wiped out" and falls asleep after

lunch due to the pain in his hips and back.  <u>Id.</u> at 48-49, 55.  When he wakes up, he

---

[5]Although Plaintiff testified that the stimulator was implanted in 1997, <u>tr.</u> at 56,
the record establishes that it was surgically implanted in 1995.  <u>Id.</u> at 843, 1188, 1197.

experiences a numb feeling in his legs and feet.  Id. at 49.  He also has trouble sleeping at

night and considers four hours of sleep a good night.  Id.  He naps during the day once or

twice for an hour to an hour and a half.  Id. at 50.  He elevates his legs and feet using his

recliner, uses a spinal cord stimulator, and uses a moist heating pad to ease the

discomfort.  Id. at 45, 49-50, 51.  He also uses a hot tub at the community center when his

legs are "really bothering" him.  Id. at 52.  In addition to the implantation of the spinal

cord stimulator and surgical repair of his spine, Plaintiff testified that he has also

undergone injections in both of his hips and his spine to help with the pain.  Id. at 55, 57.

Plaintiff testified that "some days are worse than others," tr. at 53, and that on bad

days, which he estimated to be three out of seven, he is housebound, living in his recliner,

and has difficulty standing up, going to the bathroom, and is unable to tie his shoes.  Id. at

57-58.

### C.   Summary of Medical Record

Historically, Plaintiff's primary complaint has been pain related to his back and

hips.  Some of the evidence contained in the record predates Plaintiff's alleged disability

onset date, but I include relevant information for background and context.

Plaintiff suffered a work-related back injury on June 20, 1990, when he was

carrying a vending machine.  Tr. at 1190.  He was diagnosed with chronic instability at

L4-5 which resulted in back pain and numbness in both feet.  Id.  In June 1991, Plaintiff

underwent spinal fusion at L4-5.  Id. at 1188.  Plaintiff continued to suffer from low back

pain and in 1995 underwent implantation of a spinal cord stimulator.  Id. at 843, 858,

1197-98.

In March 2014, Plaintiff again complained of low back pain radiating into his legs and returned to Norristown Orthopedic Associates, the group who treated him and performed surgery in 1991.  Tr. at 378.  Evan Kovalsky, M.D., referred him to physical therapy in May 2014, which resulted in slight improvement.  Id. at 380-81, 382.[6]  In September 2014, Dr. Kovalsky referred Plaintiff to a pain management specialist for continuing low back pain and spinal stenosis of the lumbar region.  Id. at 392.

Thomas R. Haley, D.O., the pain management specialist, performed bilateral L3 transforaminal epidural steroid injections in October 2014, resulting in Plaintiff's report of 75% improvement the following month.  See tr. at 404, 451-52.[7]  On March 19, 2015, Dr. Haley performed a procedure to replace the battery in Plaintiff's spinal cord stimulator but found "a significant portion of insulation had been stripped from the base of the lead," and instructed Plaintiff to schedule an appointment to replace the lead.  Id. at 407, 422-23, 473-74, 478.  He also instructed Plaintiff to continue tramadol and added a trial of Gralise.[8]  Id. at 408, 476.

---

[6]Dr. Kovalsky noted "some slight improvement" with physical therapy.  Tr. at 382 (Aug. 5, 2014).  Conshohocken Physical Therapy noted that Plaintiff reported "60% improvement overall since beginning physical therapy."  Id. at 395 (Aug. 4, 2014).  Later notes from Conshohocken Physical Therapy indicate that symptoms had progressively worsened in the two weeks prior to September 8, 2014.  Id. at 400.

[7]Exhibit 7F (tr. at 409-714) contains the treatment records from Dr. Haley.  Although the exhibit is 306 pages long, during the period from October 9, 2014 to April 5, 2015, Dr. Haley saw Plaintiff only seven times.  The treatment notes for these visits appear multiple times and one visit generated six copies of the same report.  Many of the same documents also appear in Exhibits 4F and 10F.

[8]Tramadol is a narcotic-like pain medication used to treat moderate to severe pain.  See https://www.drugs.com/tramadol.html (last visited May 21, 2020).  Gralise (generic

On June 4, 2015, Plaintiff underwent a lumbar myelogram[9] at Thomas Jefferson Hospital ("Jefferson"), which showed "laminectomies and fusion construct at L4-L5 [and] [a]bandoned neurostimulator wires at the L3-L4 levels." Tr. at 718-19.  A CT of the lumbar spine done the same day showed multilevel degenerative changes, no cord compression, and significant spinal canal stenosis at L2-L3.  Id. at 720.  At L1-L2, there was a small disc bulge with mild bilateral foraminal narrowing.  Id. at 721.  A CT scan of the thoracic spine showed laminectomies at T8-T9 and a spinal cord stimulator entering the spinal canal at the T9 level.  Id. at 720.

On June 18, 2015, Ashwini D. Sharan, M.D., performed surgery at Jefferson to remove the spinal cord stimulator that Plaintiff had implanted in 1995.  Tr. at 738-39.  An MRI two months later showed multilevel spondylosis and postsurgical changes including disc desiccation and height loss at L4-L5 and a broad disc bulge at L5-S1, and a right adrenal nodule consistent with a lipid rich adenoma previously seen on CT of the lumbar spine.  Id. at 795-96, 881-82.  On August 25, 2015, Dr. Sharan performed spinal decompression and "redo" fusion surgery on L2, L3, and L4.  Id. at 818-20.  Plaintiff's discharge medications included Valium and oxycodone.[10]  Id. at 898.  At his first

gabapentin, alternative brand Horizant) is an anticonvulsant used to treat neuropathic pain.  See https://www.drugs.com/gabapentin.html (last visited May 21, 2020).

[9]A myelogram is a diagnostic imaging test done using contrast dye and x-rays or computed tomography (CT) to look for problems in the spinal canal.  See https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/myelogram (last visited May 21, 2020).

[10]Valium is a benzodiazepine used to treat anxiety disorders and muscle spasms.  See https://www.drugs.com/valium.html (last visited May 21, 2020).  Oxycodone is a

postoperative visit, Plaintiff reported that his "preoperative back and leg symptoms have significantly improved and he only reports intermittent numbness and tingling to his feet, which occurs primarily at night." Id. at 831.  Jefferson treatment notes indicate that on October 12, 2015, nearly two months after surgery, Plaintiff's left leg pain has resolved, but he continued to have intermittent pain in his buttocks and a strip of numbness in his right thigh.  Id. at 919.  At that time, Plaintiff walked three-quarters of a mile daily and continued exercises at home.  Id.

Plaintiff participated in physical therapy after his surgery.  After sixteen sessions, Plaintiff reported "75% improvement overall."  Tr. at 1084.[11]  The notes for December 3, 2015 indicate that Plaintiff stated,

> "I can walk up to a mile now!  General movement is better.  I still have that lower aching and pain in my low back but the constant leg pain is gone now.  Bending is better and I can lift up lighter objects without too much of a problem. . . . I have been getting the leg pain again though and it still bothers me at night when I'm trying to sleep - it's not constant like before but I still get it.  The low back aches but it's less intense than it was!

Id.

A physical therapy progress report from January 19, 2016, indicates that Plaintiff's progress with improving mobility and strength "plateaued over the past month secondary to [patient's complaints of] increased [right] hip and [right] sided low back pain."  Id. at

---

narcotic pain medication used to treat moderate to severe pain.  See https://www.drugs.com/oxycodone.html (last visited May 21, 2020).

[11]This reference is part of a summary of prior physical therapy made in December 2016.  I was not able to locate the physical therapy notes for 2015, although there are records of prior physical therapy in June to September 2014.  Tr. at 1270-1319.

1263.  An MRI performed on February 2, 2016, showed the posterior fusion from L2

through L5, disc degeneration at L2-3, L3-4, and L4-5, with no bulging or herniation, and

a 2.3 cm right adrenal nodule.  Id. at 1510.

On March 8, 2016, Plaintiff saw Marc Effron, M.D., at Main Line Spine,

complaining of lumbar pain.  Tr. at 1052.  Dr. Effron noted reduced range of motion in

the lumbar spine in flexion, extension, and rotation worse on the right than the left, and

prescribed Horizant.  Id. at 1053.  An EMG performed on March 16, 2016, revealed "a

chronic lumbar radiculopathy predominantly affecting the bilateral L5-S1 myotomes"

with evidence for "a lower extremity sensorimotor polyneuropathy."  Id. at 1048.  Dr.

Effron added diclofenac gel[12] to Plaintiff's regimen.  Id. at 1046.  On March 23, 2016,

Dr. Effron performed bilateral S1 lumbar selective epidural steroid injections.  Id. at

1043-44.  A week later, Plaintiff returned complaining that his pain had worsened.  Id. at

1040.  The doctor recommended Plaintiff stop Percocet and added Nucynta[13] to his

regimen.  Id. at 1041.  On April 4, 2016, Dr. Effron performed a second round of bilateral

S1 lumbar selective epidural steroid injections.  Id. at 1038.  Two weeks later, Plaintiff

returned complaining of worsening pain.  Id. at 1035.  The doctor noted reduced range of

motion in Plaintiff's lumbar spine, tenderness over the facet joints at L5-S1, and reduced

---

[12]Diclofenac is a nonsteroidal anti-inflammatory drug used to treat mild to
moderate pain.  See https://www.drugs.com/diclofenac.html (last visited May 21, 2020).

[13]Percocet contains oxycodone and acetaminophen, a pain reliever which also
increases the effects of oxycodone.  See https://www.drugs.com/percocet.html (last
visited May 21, 2020).  Nucynta is a narcotic medication used to treat moderate to severe
pain.  See https://www.drugs.com/nucynta.html (last visited May 21, 2020).

stride length.  Id. at 1035-36.  He added Zanaflex[14] to Plaintiff's regimen.  Id. at 1036.

Dr. Effron performed lumbar facet joint injections at L5-S1 on May 18, 2016.  Id. at

1033.  Two weeks later, Plaintiff reported that the pain had improved by 20%, but the

doctor continued to note reduced range of motion in the lumbar spine, tenderness in the

interspaces at L5-S1, and reduced stride length.  Id. at 1030-31.  In addition to the lumbar

radicular pain from which Plaintiff had been suffering, the doctor also diagnosed

trochanteric bursitis of the right hip, for which the doctor performed a left greater

trochanter injection.  Id. at 1031.  The doctor recommended physical therapy and aqua

therapy.  Id. at 1032.

Plaintiff returned to physical therapy at Good Shephard Penn Partners on June 4,

2016, and began aquatic therapy.  Tr. at 1084.[15]  In July, after ten session of aquatic

therapy, Plaintiff continued to complain of low back and hip pain and trouble sleeping,

and there is a notation that Plaintiff "remains unable to stand >10 minutes secondary to

increased [lower back pain]."  Id. at 1105.

On August 3, 2016, in addition to the lower back and leg pain, Plaintiff also

complained of left wrist pain, which Dr. Effron diagnosed as carpal tunnel syndrome

---

[14]Zanaflex is a short-acting muscle relaxant, to treat spasticity associated with diseases like multiple sclerosis and spinal cord injuries by temporarily relaxing muscle tone.  See https://www.drugs.com/zanaflex.html (last visited May 21, 2020).

[15]It appears that Good Shepherd Penn Partners physical therapy and Conshohocken physical therapy are affiliated with one another as their records reference the same treatment location and care under Dr. Effron.  See tr. at 1083 (discharge summary from Good Shepherd), id. at 1090-1110 (treatment notes from Conshohocken). Certain of these notes also appear in Exhibits 29F and 31F.  Id. at 1321-48, 1560-88.

("CTS").  Tr. at 1028.  An EMG performed on Plaintiff's left wrist confirmed CTS.  Id. at

1024.  Dr. Effron prescribed a wrist splint and recommended proceeding with

acupuncture for his back, hip, and leg symptoms.  Id. at 1022.  The doctor also performed

a right greater trochanteric bursa injection to treat Plaintiff's continued hip pain, and

continued his medication and physical therapy.  Id. at 1028-29.

A physical therapy update for September 1, 2016, states that Plaintiff reported his

legs were doing better, sleeping was sporadic, hip pain continued with some days worse

than others, standing was "a little better," with a tolerance of 15-20 minutes, and sitting

tolerance was half an hour.  Tr. at 1098.  Plaintiff began a series of acupuncture

appointments with Dr. Effron on September 8, 2016.  Id. at 1145-46.  A week later, the

doctor noted a sitting tolerance of 15 minutes and a standing and walking tolerance of 5

minutes each.  Id. at 1142.  The following month, in addition to acupuncture, the doctor

performed trigger point injections at tender points on the right gluteal muscles.  Id. at

1137-38.

Plaintiff consulted with Benjamin Leo Gray, M.D., an orthopedist, for his CTS on

September 7, 2016.  Tr. at 1072.[16]  Dr. Gray noted that Plaintiff's left hand began

bothering him 2-3 months earlier and his right hand just 2-3 weeks earlier.  After

examination and testing, the doctor diagnosed Plaintiff with bilateral carpal and cubital

---

[16]Plaintiff was referred to Dr. Gray by his primary care practice, Penn Care
Medical Associates Valley Forge.  Tr. at 1759.  Plaintiff relied on his primary care
practice for routine vaccinations and treatment for routine ailments.  See id. at 1762
(1/13/16 - DTaP vaccination), 1751 (10/12/17 – flu vaccine), 1750 (1/12/18 –
anxiety/depression prescription for Lexapro).

tunnel syndrome, left greater than right and a left index trigger finger.  Id. at 1077.  Dr. Gray recommended surgical release of the left carpal and cubital tunnel  and left index finger, and ulnar nerve relocation surgery, which he performed on September 23, 2016. Id. at 1069, 1077.  Post-surgery, Dr. Gray described Plaintiff's symptoms as "greatly improved."  Id. at 1062.  During a follow up appointment on November 2, 2016, Plaintiff complained of left elbow bursitis. Id. at 1063.  The doctor recommended gentle compression and anti-inflammatory drugs for the bursitis and explained that it should resolve with time.  Id. at 1064.

Plaintiff returned to physical therapy on October 17, 2016, after a month-long hiatus due to his carpal tunnel surgery.  Tr. at 1091.  He complained of low back and hip pain, worse on the right that was aggravated with increased activity.  Id.  At that point, Plaintiff's standing and walking tolerance was 10-15 minutes.  Id.  On December 14, 2016, Plaintiff reported "doing [his] exercises and hitting the club more!  I'll walk in the pool[,] ride the recumbent bike or . . . walk to the gym."  Id. at 1085.  He reported being able to ride the bike for half an hour and walk 7-8 laps.  Id.

X-rays of Plaintiff's hips performed on March 30, 2017, showed slight narrowing of the superior aspect of the right hip joint and a normal left hip.  Tr. at 1132.  Dr. Effron performed bilateral greater trochanteric bursa injections on March 30, 2017.  Id. at 1451. Plaintiff continued to be seen monthly at Main Line Spine for treaetment including injections for pain relief as necessary.  See id. at 1445 (4/26/17 - bilateral L5-S1 facet joint injections), 1438 (6/8/17 – right greater trochanteric bursa injection).  Jeffery J. Rowe, M.D., installed a trial spinal cord stimulator on August 17, 2017.  Id. at 1433.  On

follow up, Plaintiff reported that his pain had improved by 70% with the trial spinal cord stimulator.  Id. at 1430.  On September 14, 2017, Dr. Rowe implanted a permanent spinal cord stimulator in the lumbar spine.  Id. at 1428.  In December, Dr. Rowe noted that Plaintiff 's pain had improved by 80%, his sitting tolerance was 30 minutes, standing tolerance 15 minutes, and walking tolerance was 20 minutes.  Id. at 1419.  During this visit, the doctor performed a right greater trochanteric bursa injection.  Id. at 1420.

Plaintiff also suffers from diabetes for which he began treatment with endocrinologists at Penn Medicine Radnor Diabetes in August 2015.  Tr. at 1411.  At the time he was taking Amaryl and metformin.[17]  Id. at 1414.  In November, Erika Lawson Tapino, M.D., noted that Plaintiff had "Well controlled Type 2 diabetes mellitus."  Id. at 1408.  The doctor added Invokana[18] to his regimen, id. at 1410, which was subsequently changed to Farxiga[19] due to insurance.  Id. at 1398.  Plaintiff's diabetes remained well

---

[17]Amaryl is an oral diabetes medication used with exercise to control blood sugar levels in type 2 diabetes.  See https://www.drugs.com/amaryl.html (last visited May 21, 2020).  Metformin is an oral diabetes medication used with exercise to control blood sugar levels in type 2 diabetes.  See https://www.drugs.com/metformin.html (last visited May 21, 2020).

[18]Invokana is an oral diabetes medication used with exercise and diet to control blood sugar levels in type 2 diabetes.  See https://www.drugs.com/invokana.html (last visited May 21, 2020).

[19]Farxiga is an oral diabetes medication used with exercise and diet to control blood sugar levels in type 2 diabetes.  See https://www.drugs.com/farxiga.html (last visited May 21, 2020).

controlled on these medications.  See id. at 1395 (6/7/16), 1387-88 (9/20/16), 1372, 1380

(1/5/17),[20] 1356 (9/28/17).[21]

      With respect to functional assessments, Dr. Effron completed a physical RFC

assessment on June 19, 2017, noting that Plaintiff could lift and carry 10 pounds, stand

and/or walk less than 2 hours and sit for less than 6 hours in an 8-hour workday and must

periodically alternate between sitting and standing.  Tr. at 1149.  The doctor also

indicated that Plaintiff was limited in his ability to use his lower extremities to use foot

controls but did not describe the nature or degree of limitation.  Id..  In addition, the

doctor opined that Plaintiff should never climb ladders/ropes/scaffolds, kneel or crawl,

could occasionally climb stairs/ramps, balance, stoop, or crouch, was limited in his ability

to reach or feel, and should avoid all exposure to hazards such as machinery or heights.

Id. at 1150-52.

      On January 4, 2016, Jeffrey Thorley, M.D., conducted a consultative examination,

tr. at 1010, during which he noted negative straight leg raising test bilaterally, "no

abnormality in [the] thoracic spine" and "[l]umbar spine is not tender.  No redness, heat,

or effusion."  Id. at 1012. [22]  Dr. Thorley diagnosed Plaintiff with hypertension, diabetes

---

    [20]The doctor described Plaintiff's diabetes as "uncontrolled" in May 2017, prior to spinal surgery.  Tr. at 1364.  However, at his next visit in September, it was again "well controlled" and the doctor indicated that his A1C was at target.  Id. at 1356.

    [21]The treatment records from Penn Medicine Radnor Diabetes also appear in Exhibit 31F.  See tr. at 1657-1723.

    [22]The Lasegue test, also known as the straight leg-raising test, checks for impingement of the nerves in the lower back by determining whether there is pain when "the symptomatic leg is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy with the

mellitus, and possible osteoarthritis in his lumbar spine.  Id. at 1012.  He opined that
Plaintiff could frequently (1/3 to 2/3 of a work day) lift and carry up to 50 pounds; sit,
stand, and walk for 8 hours each; found no limitations in his use of his hands; found that
he could frequently use his feet to operate controls; could frequently perform postural
activities; and had no environmental limitations.  Id. at 1013-17.  He found that Plaintiff
had some limited range of motion in the lumbar spine (flexion/extension 60° out of 90°
and lateral flexion 15° out of 20°).  Id. at 1020.

On January 11, 2016, at the initial consideration level, Kurt Maas, M.D., found
based on a review of the record that Plaintiff suffered from a spinal disorder and found he
was capable of occasionally lifting and carrying 20 pounds, frequently lifting and
carrying 10 pounds, standing and/or walking for 6 hours and sitting for 6 hours in an 8-
hour workday.  Tr. at 71-72.  Dr. Maas opined that Plaintiff could occasionally climb
ramps/stairs, stoop, kneel, crouch, and balance, but could never climb
ladders/ropes/scaffolds, or crawl.  Id. at 72.  In addition, the doctor found Plaintiff had no
manipulative, visual, or communicative limitations, and he should avoid concentrated
exposure to extreme cold, vibration, and hazards such as machinery or heights.  Id. at 73.

**D.    Consideration of Plaintiff's Claims**

1.    Consideration of Opinion Evidence

Plaintiff argues that the ALJ erred by failing to give controlling weight to the
opinion expressed by Dr. Effron, Plaintiff's pain management specialist, and by failing to

---

distribution of the pain indicating the nerve root involved."  Dorland's Illustrated Medical
Dictionary, 32nd ed. (2012) ("DIMD"), at 1006, 1900.

properly consider the opinion evidence in the record.  Doc. 11 at 17-21.  Defendant

responds that substantial evidence supports the ALJ's evaluation of the medical opinion

evidence.  Doc. 12 at 10-13.

For claims filed prior to March 27, 2017, the governing regulations dictate that an

ALJ must give medical opinions the weight she deems appropriate based on factors such

as whether the physician examined or treated the claimant, whether the opinion is

supported by medical signs and laboratory findings, and whether the opinion is consistent

with the record as a whole.  20 C.F.R. § 404.1527(c).[23]  A treating source's medical

opinion regarding the nature and severity of an individual's impairments will be entitled

to controlling weight only if it was well-supported by medically acceptable clinical and

laboratory diagnostic techniques, and not inconsistent with other substantial evidence in

the record.  S.S.R. 96-2p, "Policy Interpretation Ruling Titles II and XVI:  Giving

Controlling Weight to Treating Source Medical Opinions," 1996 WL 374188, at *1 (July

2, 1996).[24]

---

[23]Effective March 27, 2017, the Social Security Administration amended the rules regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff's application was filed prior to the effective date of the new regulations, the opinion-weighing paradigm is applicable.

[24]Concurrent with the amendment of the regulations governing the evaluation of medical evidence referenced in the prior footnote, the Commissioner rescinded Social Security Ruling 96-2p.  However, the rescission of the Ruling is effective only for claims filed after March 27, 2017.  See S.S.R. 96-2p, "Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p," 2017 WL 3928305, at *1 (March 27, 2017) ("This rescission will be effective for claims filed on or after March 27, 2017.").

Even if not entitled to controlling weight, a treating physician's opinion is generally entitled to greater weight than that of a physician who conducted a one-time examination of the claimant as a consultant.  See, e.g., Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) (citing Mason v. Shalala, 994 F.2d 1058, 1067 (3d. Cir. 1993)).  An ALJ may afford a medical opinion "more or less weight depending on the extent to which supporting explanations are provided."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)).  "The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." Id. (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Plummer, 196 F.3d at 429; see also 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Also, a physician's statement that a Plaintiff is "disabled" or "unable to work" is not dispositive. Adorno, 40 F.3d at 47-48; see also 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").  Rather than blindly accept a medical opinion, the ALJ is required to review all the medical findings and other evidence and "weigh the relative worth of [the] treating physician's report."  Adorno, 40 F.3d 3d at 48. The ALJ is "free to accept some medical evidence and reject other evidence," so long as

the ALJ "provides an explanation for discrediting the rejected evidence." Zirnsak, 777 F.3d at 614.

Before discussing Dr. Effron's RFC assessment directly, I comment on Plaintiff's allegation of an inconsistency in the ALJ's decision. As will be discussed, the ALJ's RFC determination does not mirror any of the assessments provided in the record. This is not error in and of itself. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006) ("Surveying the medical evidence to craft an RFC is part of the ALJ's duties."). However, the ALJ's description of the weight she gave to the assessments in the record does not correspond exactly to her RFC assessment. Although the ALJ stated that she gave "some" weight to Dr. Effron's RFC assessment, tr. at 26, and "significant weight" to the opinions of Dr. Thorley, the consultative examiner, and Dr. Maas, the state agency reviewing physician, id. at 25, the ALJ's RFC assessment is more consistent with Dr. Effron's in certain respects. With respect to the weight limitation related to the physical exertion requirement, Dr. Thorley found that Plaintiff could lift and/or carry 21 to 50 pounds frequently, which is consistent with medium work. Id. at 1013; see 20 C.F.R. § 404.1567(c). Dr. Maas found that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, consistent with light work. Tr. at 72; see 20 C.F.R. § 404.1567(b). Dr. Effron, on the other hand, found that Plaintiff could frequently lift 10 pounds, the exertional definition of sedentary work. Tr. at 1149; see 20 C.F.R. § 404.1567(a). In her RFC assessment, the ALJ found that Plaintiff was capable of performing sedentary work with other limitations, thus adopting Dr. Effron's opinion in this respect. Id. at 21. In other respects, the ALJ's assessment is more similar to those of

Drs. Thorley and Maas.  The fact that the ALJ credited Dr. Effron in one respect did not require the ALJ to adopt all aspects of Dr. Effron's opinion, and I find no error in the ALJ's terminology in the weight given to the opinion evidence.  Moreover, as will be discussed, the ALJ's RFC assessment is supported by substantial evidence.

Dr. Effron concluded in June of 2017, that Plaintiff could lift and carry 10 pounds, stand and/or walk for less than 2 hours and sit for less than 6 hours in an 8-hour day with the ability to alternate between sitting and standing, that Plaintiff's ability to push and/or pull was limited in his lower extremities, and he was limited in reaching and feeling.  Tr. at 1149-51.  The key considerations at issue are Dr. Effron's limitations on sitting, standing, and walking, and the doctor's finding that Plaintiff was limited in reaching and feeling with his upper extremities.  Plaintiff complains that Dr. Effron's assessment is entitled to controlling weight and that, even if not, the ALJ failed to properly consider Dr. Effron's opinion.

First, to the extent Plaintiff argues that Dr. Effron's assessment is entitled to controlling weight, the ALJ explained that his assessment was not entitled to controlling weight because it was not well supported by medically acceptable clinical findings and was inconsistent with other evidence in the record.  Tr. at 26.  This conclusion is supported by substantial evidence.  As the ALJ discussed earlier in her decision, lumbar spine x-rays taken in January 2016, after Plaintiff's most recent spinal fusion surgery, showed no evidence of instability and only moderate disc space narrowing, id. at 23 (citing id. at 1246); an MRI done the following month showed a right adrenal nodule, but no disc herniation, spinal stenosis, or foraminal narrowing, id. at 23 (citing id. at 1247);

an EMG and nerve conduction study from March 2016 was suggestive of chronic lumbar
radiculopathy and lower extremity sensorimotor polyneuropathy, id. at 23 (citing id. at
1048); hip x-rays done in March 2017 showed only slight joint space narrowing, id. at 23
(citing id. at 1132); and an MRI of the lumbar spine from April 2017 showed only mild
central canal narrowing at L1-2 and mild to moderate foraminal narrowing at L1-2, L2-3,
and L4-5.  Id. at 23 (citing id. at 1124-25).  In addition, the ALJ noted that the objective
signs and findings from the Plaintiff's physicians and Dr. Thorley did not support a
finding of disabling pain.  The ALJ relied on Dr. Thorley's examination noting some
decreased range of motion in the lumbar spine, but otherwise normal examination, and a
negative straight leg-raising test.  Id. at 23 (citing id. at 1010-20).  Likewise, although Dr.
Effron noted tenderness of the lumbar spine and hips, decreased lumbar range of motion,
and slightly decreased strength of the hip flexors, Plaintiff's strength was otherwise
normal and other testing was also normal including negative straight leg-raising tests,
normal range of motion of the hips and no other significant abnormalities of the
extremities.  Id. at 24 (citing id. at 1021-61, 1119-47, 1419-1505).

The same rationale is also relevant to the ALJ's consideration of Dr. Effron's
assessment in the opinion-weighing paradigm.  As noted above, there are several criteria
that the ALJ considers in assessing the weight to give medical opinion evidence:
examining and treatment relationship, supportability, consistency with the record, and
specialization.  20 C.F.R. § 404.1527(c).  The lynchpin to the consideration of medical
opinion evidence is consistency.  Id. § 404.1527(c)(4) ("[T]he more consistent a medical

opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Here, the ALJ did not reject Dr. Effron's assessment.  As noted, in some respects, the ALJ's assessment is similar to Dr. Effron's.  However, after recognizing the treatment relationship that Dr. Effron had with Plaintiff, the ALJ explained that she gave the assessment only some weight because it was not supported by clinical findings as discussed above and was inconsistent with other evidence in the record.  Specifically, the ALJ noted that Dr. Effron's limitation in Plaintiff's ability to reach and feel was a vague limitation and that the doctor had not identified the basis for the limitation.  Id. at 26.  If it were based on Plaintiff's CTS, such condition was "treated successfully with surgery and improved within 12 months."  Id. at 27.

In addition, the ALJ noted that Plaintiff's "description of daily activities is also inconsistent with his complaints of disabling symptoms and limitations."  Tr. at 25.  I will address Plaintiff's challenges to this aspect of the ALJ's opinion in the next section of this Memorandum.  See infra at 26-32.

Because the ALJ adequately explained her reasons for discounting Dr. Effron's assessment, relying on the treatment record as a whole, including objective medical testing results and Dr. Effron's own examination findings, and on the evidence regarding Plaintiff's daily activities, I find no error in the ALJ's evaluation of Dr. Effron's assessment.

2.     Plaintiff's Subjective Complaints

Plaintiff also argues that, "[i]n assessing the credibility of Plaintiff's complaints of disabling pain, the ALJ blithely ignored the longitudinal two-year post-surgical history of consistent and persistent complaints of moderate to severe pain."  Doc. 11 at 10.[25] Defendant responds that substantial evidence supports the ALJ's determination regarding Plaintiff's subjective complaints, arguing that the ALJ properly relied on the diagnostic and objective medical findings, and Plaintiff's testimony concerning his activities in considering his subjective complaints.  Doc. 12 at 5-10.

With regard to evaluating a claimant's subjective symptoms, the regulations require the ALJ to consider all symptoms, including pain, and the extent to which such symptoms are reasonably consistent with the objective medical and other evidence, including the claimant's statements and descriptions from medical and non-medical sources regarding how the symptoms affect the claimant's activities of daily living and ability to work.  20 C.F.R. § 404.1529(a).  The regulations make clear that statements about a claimant's pain or other symptoms cannot alone establish a disability, but instead there must be objective medical evidence from an acceptable medical source that shows the presence of an impairment that could reasonably be expected to produce the

---

[25]Plaintiff's claim is based on Social Security Ruling 16-3p, which superseded Ruling 96-7p, which had the same title, by eliminating the term "credibility" from the Administration's policy guidance in order to "clarify that subjective symptom evaluation is not an examination of the individual's character."  SSR 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029, at *1 (March 16, 2016) ("SSR 16-3p").  SSR 16-3p applies to all decisions on or after March 28, 2016.  Id. 2017 WL 5180304, at *13 n.27 (Oct. 25, 2017) (establishing applicability date of March 28, 2016).

symptoms alleged and that, when considered with all the other evidence, would lead to a disability determination.  Id.

SSR 16-3p provides guidance about how the Commissioner will evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims.  See S.S.R. 16-3p, 2016 WL 1119029.  The Ruling directs an ALJ to conduct a two-step process to (1) determine whether he claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms, and (2) evaluate the intensity and persistence of the claimant's symptoms such as pain and determine the extent to which an individual's symptoms limit his ability to perform work-related activities.  Id. at *3-5.

Third Circuit case law does not require an ALJ to accept a plaintiff's complaints concerning his symptoms, but rather requires that they be considered.  See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011).  An ALJ may disregard subjective complaints when contrary evidence exists in the record, see Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993), but must explain why she rejects such complaints with references to the medical record.  See Hartranft v. Apfel, 181 F.3d 358, 362 (3d. Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence."); Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990) (noting that ALJ may reject claim of disabling pain where he has considered subjective complaints and specified reasons for rejecting claims).  In addition to objective medical evidence, in evaluating the intensity and persistence of pain and other symptoms, the ALJ should consider the claimant's daily activities; location, duration, frequency and intensity

of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medications; treatment other than medication; and other measures the claimant uses to address the pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

In her opinion, the ALJ stated the following with regard to Plaintiff's subjective complaints:

> [Plaintiff] asserted that he is unable to work due to back pain, hip pain and numbness in the extremities, muscle spasms, and fatigue. He said his medications caused constipation and insomnia. According to [Plaintiff], his symptoms affected his ability to lift, walk, climb stairs, squat, bend, stand, reach, sit, kneel, and complete tasks. He estimated he could lift no more than 5 pounds at a time ([Tr. at 191-99, 201-10, 221-26, 239, 243, 39-58]).
>
> . . . .
>
> After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to produce some of the above alleged symptoms. However, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect [Plaintiff's] ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

Tr. at 22.

The ALJ then reviewed the medical record, tr. at 22-25, noting the diagnostic test results from x-rays and MRIs performed after his fusion surgery in August 2015, which showed stable hardware, no disc herniation, spinal stenosis, or foraminal narrowing, and slight joint space narrowing of the right hip. Id. at 23 (citing id. at 1246 – 1/7/16 lumbar x-ray, 1247 – 2/2/16 lumbar MRI, 1132 – 3/30/17 x-ray hips, 1124-25 – 4/12/17 lumbar MRI). The ALJ also reviewed the treatment notes from Dr. Welsh, Plaintiff's new

primary care provider, Dr. Effron, and consultative examiner Dr. Thorley, identifying repeated notations of decreased range of motion in the lumbar spine, but symmetric deep tendon reflexes, normal sensation and full strength in all extremities, normal grip strength, repeated negative straight leg-raising tests, and slightly decreased strength in the bilateral hip flexors.  Id. at 23-24 (citing id. at 1010-20 – Thorley consultative exam, 1748-62 – Welsh, 1021-61, 1119-47, 1419-1745 – Effron).  The ALJ also reviewed Plaintiff's physical therapy notes which indicated good progress with decreasing muscle cramping, increasing tolerance for bike riding, walking, and walking in the pool.  Id. at 24 (citing id. at 1256, 1085).

In addition to the medical record, the ALJ considered Plaintiff's daily activities in assessing the severity of his symptoms.

> [Plaintiff's] description of daily activities is also inconsistent with his complaints of disabling symptoms and limitations.  [Plaintiff] told consultative physician Dr. Thorley in January 2016 that he was able to bathe and dress himself, and that he was able to help with cooking, cleaning, laundry, and shopping.  He also said he enjoyed socializing with friends, going to the fire house, watching television, and listening to the radio ([tr. at 1010]).  In December 2016, he said he had been exercising regularly at a local fitness club, which included being able to walk in the pool for 7 to 8 laps, ride the recumbent bicycle for 30 minutes, or walk around the gym.  He also said he had recently walked in a parade, with only little soreness ([id. at 1085]).  [Plaintiff] further stated in the record that, although he did not do any yard work, he was able to prepare simple meals and do light household chores, such as washing dishes, dusting, and general tidying up.  He also said he regularly attended church and visited the fire department for a few hours each week.  As discussed above, he said he was working part-time, although he said he needed to nap and/or elevate his legs after each shift ([id. at 201-10, 221-27, 39-58]).  Such evidence, when considered with the other objective medical evidence discussed above, further

> supports a finding that [Plaintiff] remains capable of
> performing a reduced range of sedentary work.  For these
> reasons, and for the other reasons discussed above, the
> undersigned finds that [Plaintiff's] complaints of disabling
> symptoms are not fully supported by the record.

Id. at 25.

Plaintiff takes issue with several aspects of the ALJ's analysis.  First, Plaintiff complains that the ALJ failed to properly consider Plaintiff's post-surgical pain management treatment.  Doc. 11 at 3.  Plaintiff seems to argue that the ALJ erred in characterizing the physical examinations as "relatively normal" because Dr. Effron proceeded to pursue a treatment regimen including injections, pain medicines, acupuncture, physical therapy, and activity modification.  Id. at 3-4.

I note that the Plaintiff's treatment is just one of many factors that the ALJ considers in assessing the intensity and persistence of symptoms.  The ALJ must also consider the objective medical evidence.  20 C.F.R. § 404.1529(c)(2).  Here, the ALJ did just what was required.  Contrary to Plaintiff's assertion, the ALJ noted that Plaintiff received various treatments from Dr. Effron including lumbar joint injections, lumbar epidural steroid injections, hip injections, acupuncture, and pain medications for his low back, hip, and leg pain.  Tr. at 24.  The ALJ also reviewed the diagnostic testing and objective examination findings.  Considering the evidence as previously discussed, the ALJ's characterization of the bulk of the objective testing and examination findings as "relatively normal" is supported by substantial evidence.  See supra at 20-21.

Plaintiff also complains that the ALJ ignored Plaintiff's complaints of pain after the second spinal fusion, prior to the implant of the spinal cord stimulator, and

mischaracterized the physical therapy notes as "demonstrating good results," arguing that Plaintiff's walking and exercising abilities were part of his physical therapy program and took place before Dr. Sharan referred him for pain management. Doc. 11 at 10-11. First, the ALJ did not ignore Plaintiff complaints of pain after the second fusion surgery. The ALJ specifically considered the physical therapy notes during this time in assessing Plaintiff's symptoms. Second, the ALJ did not err in considering the efficacy of and progress Plaintiff made in physical therapy, as she was required to consider the efficacy of treatment in assessing Plaintiff's symptoms. 20 C.F.R. § 404.1529(c)(3). Also, the ALJ did not mischaracterize the therapy progress notes. Post-fusion surgery, the notes indicate that Plaintiff reported a 75% improvement overall. Tr. at 1084. In September 2016, Plaintiff reported that the cramping in his legs has "been a lot better," with a notation that he could walk farther and his sitting tolerance had increased to half an hour. Id. When he returned to physical therapy in December 2016, Plaintiff reported sleeping better and that the cramping in his legs had been "a lot better." Id. at 1085. The notes indicate that Plaintiff met his physical therapy goals for December 14, 2016, which included sleeping through the night, walking farther and with less difficulty, and being able to jog in deep water at the pool for exercise. Id.[26]

---

[26]Plaintiff also argues that the ALJ ignored notations in the medical record after Plaintiff's December 2015 discharge from physical therapy. Doc. 10 at 11. In fact, Plaintiff's lapse in physical therapy was short-lived. Plaintiff resumed physical therapy in early June 2016, tr. at 1084, and the ALJ properly relied on his physical therapy notes for this period of time.

Plaintiff next complains that the ALJ impermissibly relied on Plaintiff's statement that he had walked in a parade in assessing his symptomatology.  Doc. 11 at 11.  Relying on a line of cases beginning with Smith v. Califano, 637 F.2d 968 (3d Cir. 1981), in which the Third Circuit held "that "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity," Plaintiff argues that the ALJ's reliance on a one-time activity was improper.  Doc. 11 at 11.

Plaintiff's reliance on this reasoning is misplaced.  Smith and Fargnoli v. Massanari, 247 F.3d 24 (3d Cir. 2001), upon which Plaintiff also relies, stand for the proposition that sporadic and transitory activities cannot be used to establish that a plaintiff can continuously engage in substantial gainful activity.  Here, Plaintiff's participation in the parade was the culmination of increased exercise, activities, and an ability to walk for longer periods/distances.[27]  Unlike the ALJs' decisions in Smith and Fargnoli, where the ALJ relied on sporadic trips to conclude the claimants could perform substantial activity,[28] here the ALJ reviewed the evidence detailing how Plaintiff's activity and abilities had increased since his spinal fusion surgery.  The ALJ also reviewed Plaintiff's activities which included helping with the cooking, cleaning, laundry, and shopping, socializing with friends, visiting the firehouse, exercising regularly at a local

---

[27]Plaintiff also argues that Plaintiff's activities including his independence with hygiene, helping around the house, socializing, and listening to the radio are not indicative of the ability to engage in full-time employment.  Doc. 11 at 15.

[28]In Fargnoli, the ALJ relied on a one-time trip to Europe, and in Smith, the ALJ relied on two hunting trips, in determining each claimant could perform substantial gainful activity.  Fargnoli, 247 F.3d at 40 n.5; Smith, 637 F.2d at 971.

fitness club, which was part of his home physical therapy routine, and working part time.
Tr. at 25.  Based on the evidence in the record as reviewed by the ALJ, these activities
were not sporadic and transitory.  Notably, at the administrative hearing, Plaintiff testified
that he continued to work part time for Conshohocken using a computer to look up license
plates in the parking ticket system.  Id. at 41.  Plaintiff's activities are inconsistent with the
symptom severity he claims.  I find no error in the ALJ's consideration of this evidence.

Plaintiff next argues that the ALJ erred in relying on objective testing results
obtained after his 2015 fusion surgery, characterizing the ALJ's reference to studies
showing no new pathology as suggesting that lumbar fusion surgery "will, in all cases,
resolve the patient's pain after addressing the pre-operative lesions and abnormalities"
Doc. 11 at 11-12.  Plaintiff proceeds to cite articles indicating that fusion surgery is not
more successful than more conservative treatments.  Id. at 12.  Defendant complains that
Plaintiff is asking this court to impermissibly reweigh the evidence.  Doc. 12 at 10.

In determining the intensity and persistence of pain and other symptoms, the
governing regulations require the ALJ to consider "the medical signs and laboratory
findings and statements" regarding symptomatology and the objective medical evidence.
20 C.F.R. § 404.1529 (a)-(c)(2).  SSR 16-3p, governing the evaluation of symptoms,
requires the ALJ to consider, among other things, "whether an individual's statements
about the intensity, persistence, and limiting effects of his or her symptoms are consistent
with the medical signs and laboratory findings of record."  SSR 16-3p, 2016 WL
1119029, at *4.  As previously discussed, the ALJ found that "[Plaintiff] alleged
symptoms more severe than the pathology shown on lumbar spine studies in the record

since [his lumbar fusion surgery]," <u>tr.</u> at 23, and proceeded to discuss the medical evidence which Plaintiff concedes shows no defect in the fusion, no herniation, instability or other acute pathology.  Doc. 11 at 11-12.  I find no error in the ALJ's discussion of the objective test results.  <u>See</u> <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190 (3d Cir. 1986) (reiterating substantial evidence standard).

Plaintiff also complains of the ALJ's reliance on the notations from Dr. Welsh, Plaintiff's new primary care physician.  Doc. 11 at 12-13.[29]  Plaintiff complains that "the ALJ attempted to elevate the import and value [of] an isolated office visit note of a non-specialist family physician, who specifically deferred treatment of the low back condition to the appropriate specialist, over the longitudinal records of the orthopedic surgeon and pain management specialist."  <u>Id.</u> at 13.  First, the ALJ recognized Dr. Welsh was not a specialist and noted that Plaintiff's January 2016 visit was to establish primary care.  <u>Tr.</u> at 24.  Second, there is nothing inappropriate in the ALJ's consideration of Dr. Welsh's observations.  The ALJ noted that Dr. Welsh found right paravertebral lumbar tenderness on examination, but had a negative straight leg-raising test, normal strength, and no abnormalities of the extremities.  This is exactly the type of information the regulations contemplate the ALJ should consider in assessing the intensity of a claimant's symptomatology.  <u>See</u> 20 C.F.R. § 404.1529(c)(2) (requiring consideration of objective medical evidence); <u>see also</u> SSR 16-3p, 2016 WL 1119029, at *4 ("objective medical

---

[29]To the extent Plaintiff challenges the ALJ's consideration of Dr. Thorley's opinion in this section of his brief, Doc. 11 at 13-14, I have addressed the issue in discussing the first claim.

evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms").

Plaintiff next complains that the ALJ erred by substituting her lay opinion for that of the doctors in considering the intensity of Plaintiff's symptoms, arguing that "the ALJ strayed far into the realm of inappropriate lay opinion when she stated that 'the claimant has alleged symptoms more severe than the pathology shown on lumbar spine studies in the record since his surgery.'"  Doc. 11 at 16.  An ALJ may not independently review and interpret laboratory results.  See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985). Here, the ALJ did not interpret any of the raw imaging of Plaintiff's spine or hips, relying instead on the medical reports interpreting the films.  See, e.g., tr. at 23 (referring to August 10, 2015 MRI – citing MRI report prepared by Michael Wolf at Jefferson Associates in Radiology).  The fact that those reports ruled out diagnoses that could cause spine-related pain, such as herniation, is sufficient to provide substantial evidence to support the ALJ's finding that the spine studies did not support the severity of pain alleged by Plaintiff.  SSR 16-3p, 2016 WL 1119029, at *5 ("A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").

Finally, Plaintiff complains that his work ethic should have been considered in his favor in the ALJ's analysis.  Specifically, Plaintiff notes that after his first spinal fusion in 1992, he returned to full-time employment six years later and remained for a long period of time.  This "should certainly be considered trustworthy rather than unbelieving

skepticism." Doc. 11 at 17. The Third Circuit has held that the court should consider a substantial work history in assessing a claimant's credibility with respect to testimony of subjective pain and an inability to perform work. Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979).[30] However, work history "'is only one of many factors an ALJ may consider in assessing a claimant's subjective complaints.'" Sanborn v. Colvin, Civ. No. 13-224, 2014 WL 3900878, at *16 (E.D. Pa. Aug. 11, 2014) (quoting Thompson v. Astrue, Civ. No. 09-519, 2010 WL 3661530, at *4 (W.D. Pa. Sept. 20, 2010), and citing 20 C.F.R. § 404.1529(c)(3)), aff'd 613 F. App'x 171 (3d Cir. 2015). "'Indeed a claimant's work history alone is not dispositive of the question of his credibility, and an ALJ is not required to equate a long work history with enhanced credibility.'" Id. (quoting Thompson, 2010 WL 3661530, at *4). In affirming the district court in Sanborn, the Third Circuit concluded that the ALJ's failure to consider the claimant's substantial work history did not require remand because the ALJ explained her reasoning and Plaintiff's testimony of more restrictive abilities was belied by the medical evidence and evidence of a more active lifestyle. 613 F. App'x at 177.

Here, as discussed above, the ALJ adequately explained her consideration of Plaintiff's testimony, relying on the medical evidence and his statements regarding his activities to craft the RFC assessment, and that assessment is supported by substantial

---

[30]In Dobrowolsky, the Third Circuit held that "when the claimant has a work record like Dobrowolsky's twenty-nine years of continuous work, fifteen with the same employer, his testimony as to his capabilities is entitled to substantial credibility." 606 F.2d at 409.

evidence. Thus, I conclude the ALJ's failure to specifically consider Plaintiff's work history does not require remand.

## IV.  **<u>CONCLUSION</u>**

The decision of the ALJ is supported by substantial evidence.  The ALJ properly considered the medical opinion evidence and her reasons for not fully crediting the assessment provided by Plaintiff's pain management specialist.  The ALJ also properly considered the medical evidence and Plaintiff's statements concerning his activities in assessing his subjective complaints.  Even if Plaintiff's work history were considered substantial enough to support an enhanced credibility finding, the fact that the ALJ failed to specifically consider Plaintiff's work history in that assessment does not require remand because the ALJ's RFC assessment was supported by the medical evidence and Plaintiff's testimony concerning his activities.

An appropriate Order follows.